[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14682

_____

D.C. Docket No. 1:18-cv-24013-UU

ARTURO O. SIMON,

Plaintiff-Appellant,

versus

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 12, 2021)

ON PETITION FOR REHEARING

Before LAGOA, ANDERSON, and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

The Petition for Panel Rehearing filed by the Commissioner, Social Security Administration, is GRANTED. The opinion previously issued as 1 F.4th 908 (11th Cir. 2021), is withdrawn and the following opinion is issued in its stead.

This appeal requires us to decide whether the Social Security Administration ("SSA") properly evaluated the evidence supporting Arturo Simon's claim for disability benefits under Title II of the Social Security Act. In his application, Simon stated that he was no longer able to work due to various psychiatric conditions, which included chronic depression, anxiety, and bipolar disorder. Simon received a hearing before an administrative law judge ("ALJ"), who ultimately found that he was not disabled and denied his claim for benefits.

In reaching that decision, the ALJ gave little or no weight to three pieces of evidence in the record indicating that Simon's mental illness prevents him from maintaining a job: (1) the opinions of Simon's treating psychiatrist, (2) the opinions of a consulting psychologist who examined Simon at the request of the SSA, and (3) Simon's own testimony as to the severity of his symptoms. Because we conclude that the ALJ did not articulate adequate reasons for discounting this evidence, which provided support for a finding of disability, we will remand to the agency for further proceedings.

## I.    BACKGROUND

2

Simon filed his current application for disability benefits in March of 2015, claiming to be disabled due to his deteriorating mental health. He previously had filed another such application in May of 2014, which was denied later that year. This appeal relates solely to Simon's 2015 application.

The SSA denied Simon's application after an initial review, at which point Simon requested and received a formal hearing before an ALJ, which took place on July 24, 2017. Below, we begin with a description of the medical evidence and testimony that was submitted to the ALJ, before moving on to discuss the ALJ's disability decision, and finally to discuss our reasons for concluding that a remand is required.

### A. Summary of the SSA Record

#### 1. Dr. Turner's Opinions

Dr. Rosa Turner was Simon's treating psychiatrist from 2013 to 2017. During that period, she met with him approximately thirty-two times and kept regular notes on his mental condition. Thus, Dr. Turner's treatment notes offered an extensive and detailed account of Simon's psychiatric history.

At his initial evaluation with Dr. Turner in May of 2013, Simon reported symptoms of insecurity, losing sight of reality, physical and mental exhaustion, poor self-esteem, lack of sex drive, road rage, poor memory, loss of focus and concentration, severe mood swings, and instances of obsessive-compulsive

behavior.  Simon stated that he had been experiencing these problems as long as he could remember, even in childhood, and he had been taking mental-health medication for around twenty years.  Dr. Turner recorded in her notes that Simon displayed slowed activity, depression, anxiety, irritability, decreased motivation, low energy, auditory hallucinations, and suicidal ideation.  She also wrote that his short-term memory, concentration, and attention span were impaired.  Dr. Turner ultimately diagnosed Simon with bipolar disorder, described him as having severe psychosocial or environmental problems, and started him on a course of psychiatric treatment with medication.

Some entries in Dr. Turner's notes suggested that, at times, this treatment helped Simon to a degree.  In December of 2013, for example, Dr. Turner recorded that Simon was "very stable" and had improved.  Her notes made similar references to Simon being "stable on medication" in June of 2014, July of 2014, November of 2014, April of 2015, and June of 2016.  In nearly all of these instances, however, Dr. Turner also wrote that Simon continued to suffer from significant symptoms of mental illness—such as panic attacks, racing thoughts, and episodes of anger.  Indeed, several of the notations in which Dr. Turner described Simon as "stable on his medication" went on to say that he was "not coping well."

4

On many other occasions, meanwhile, Dr. Turner indicated that Simon's overall condition was quite serious, and that it was worsening rather than improving. In September of 2014, Dr. Turner wrote that Simon was extremely depressed, having difficulty concentrating, suffering from panic attacks, and refusing to leave his house out of fear. In January of 2015, she wrote that Simon was paranoid to the point that he would not go out unless absolutely necessary, and that he was unable to function, maintain his train of thought, or process information. In July of 2015, she wrote that Simon was experiencing anger spells and mood swings, to the point that his wife was growing worried because he would "change personalities very easily" and sometimes would lose touch with reality. In August of 2015, she wrote that Simon displayed slowed speech and motor skills, that he could not focus or concentrate, and that he was isolating himself from others.

Dr. Turner continued to describe these types of symptoms throughout her four years of treating Simon. In September, October, and December of 2015, she recorded that Simon was depressed, paranoid, and refused to see others. In February and March of 2016, she wrote that Simon's symptoms remained serious, that he was unable to concentrate, that he would not talk, and that he could not control his racing thoughts. In August of 2016, she wrote that Simon was depressed, severely anxious, and could not concentrate or maintain his train of

5

thought.  In March and April of 2017, she wrote that Simon was unable to concentrate and suffered from slowed motor skills.  In July of 2017, she recorded that Simon had isolated himself completely from others.

As early as October of 2014, Dr. Turner opined that Simon's psychological impairments rendered him entirely unable to work or handle any type of stress. She described him at that time as being in a "complete state of depression" with racing thoughts, frequent panic attacks, and paranoia.  Her treatment notes reiterated that conclusion in March and May of 2015, both times stating that Simon was unable to work in any role because of his inability to focus or process information.

In July of 2017, Dr. Turner submitted a "mental capacities evaluation" to the SSA in connection with Simon's disability claim.  In her evaluation, she again diagnosed Simon as suffering from bipolar disorder, mixed with severe anxiety and panic attacks.  She opined that Simon had "extreme" limitations[1] in his abilities to:

- understand, remember, or apply information;

- interact with others;

- concentrate, persist, or maintain pace; and

---

[1]    The SSA considers a claimant to have an "extreme" limitation in an area of mental functioning if he or she is "not able to function in [that] area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 404, Subpart P, Appendix I.

- adapt or manage himself.

She also opined that Simon had "marked" limitations[2] in numerous other areas, including:

- his ability to perform simple tasks on a full-time basis;

- his ability to perform work requiring regular contact with others; and

- his ability to respond appropriately to the stress of customary work pressures.

According to Dr. Turner's assessment, Simon "has been in a critical state of mind for several years now," and his condition "will only get worse" with time. She wrote that Simon "is stable at present time—but we must maintain him this way to avoid severe decompensation."

Viewed as a whole, Dr. Turner's comprehensive clinical records portray Simon as a person living with a severe combination of bipolar disorder, depression, and anxiety that significantly impairs his mental and social functioning.

## 2. Dr. Marban's Opinions

During its evaluation of Simon's 2014 claim for disability benefits, the SSA arranged for Simon to meet with Dr. Elsa Marban for a consultive mental examination. Dr. Marban recorded that Simon drove himself to the exam and

---

[2]    The SSA considers a claimant to have a "marked" limitation in an area of mental functioning if his or her "functioning in [that] area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § 404, Subpart P, Appendix I.

arrived half an hour early.  She described Simon as cooperative, coherent, and loquacious, though he had to be redirected often.  She also noted that Simon was appropriately groomed and displayed normal "psychomotor activity."

Simon reported to Dr. Marban that he had been suffering from—among other things—low energy, panic attacks, an inability to control his aggression, mood swings, racing thoughts, and difficulty concentrating.  He explained that he began experiencing concentration problems at his previous job and would give unrelated responses when his supervisor asked him questions.  Simon also informed Dr. Marban that he had resigned from another job several years before, following an angry outburst in which he threatened to push his supervisor through a balcony.

Dr. Marban recorded that Simon was alert during their examination and oriented to place, time, and situation.  She rated his remote memory as "good," his immediate memory as "fair," and his recent memory as "poor."  She rated his abstract-reasoning capabilities as "good" because he could interpret basic proverbs and describe how two things were similar.  She also wrote that he had a good fund of information, such as being able to identify the direction in which the sun rises, the number of weeks in a year, the capital of Italy, and the continental location of Brazil.  She stated that he displayed good judgment and fair insight into his

8

psychological issues—such as recognizing that, to improve his condition, he needed to be on the right medication.

Dr. Marban diagnosed Simon with Persistent Depressive Disorder, Generalized Anxiety Disorder, Panic Disorder, and Intermittent Explosive Disorder. She recorded that Simon could handle his own finances as well as groom himself and bathe on his own, though there were days that he chose not to bathe because he lacked motivation. She noted that his socialization was limited to occasionally meeting friends for dinner. Regarding his ability to work, Dr. Marban concluded that Simon would have difficulties concentrating, completing tasks, accepting instructions, and responding to criticism from supervisors.

### 3. Other Agency Consultants

In addition to Dr. Marban, a number of other medical professionals also evaluated Simon on behalf of the SSA. Shortly before his psychiatric evaluation by Dr. Marban in 2014, Simon also met with Dr. Miesha Merati for a physical examination. At that time, he reported suffering from depression, short-term memory loss, and panic attacks. He also reported attempting to hang himself several months before and having thoughts of harming others, particularly while driving. He stated that he was able to dress himself and shop on his own, though he did not do household chores.

In the "Mental Status" section of her evaluation form, Dr. Merati recorded that Simon had a normal affect, coherent conversation, no hallucinations or delusions, no overtly suicidal or homicidal ideation, a "grossly intact" memory, and normal cognitive functioning. By her assessment, Simon's cognitive and executive functions "appear[ed] to be commensurate with [his] age, socioeconomic status, and claimed education." She noted that his chronic pain and depression limited his daily activities, but she did not list the specific areas in which he was limited or elaborate on the extent of his limitations. Dr. Merati did not express an opinion on Simon's capacity to work.

Dr. George Grubbs and Dr. Anne-Marie Bercik both reviewed some of Simon's medical records, but did not personally examine Simon themselves. Dr. Grubbs' report determined that Simon had no restrictions in his daily activities, and only mild difficulties in social function, concentration, persistence, and pace. Dr. Grubbs also opined that, while Simon's psychological impairments could be reasonably expected to produce the types of symptoms that Simon had reported, Simon's medical records as a whole did not indicate that his symptoms were as severe as claimed. Dr. Bercik issued a second report several months later, in which she agreed with Dr. Grubbs' conclusions.

4. Simon's Hearing Testimony

10

At his hearing before the ALJ, Simon testified that he was sixty-two years old, lived with his wife, had two years of college education, and previously had worked in sales.

Simon testified that he had stopped working in March of 2014 because of his depression and inability to concentrate. Specifically, he explained that his inability to focus and his memory problems kept him from completing tasks, and that his depression caused him to isolate himself. As an example, he stated that when his wife asked him to go to the grocery store nearby and pick up two or three items, he would forget them before reaching the store. He testified that he had attempted suicide and no longer cared whether he was alive or dead. He testified that he no longer got along with his wife and did not socialize with anyone.

Simon went on to report having mood swings nearly every day, as well as uncontrollable spikes of aggression. He testified that his wife handled the finances because he would forget to pay bills on time, and that she gave him his medications. He testified that he would not leave the house except for a handful of locations, such as the grocery store, because he felt safer at home. He testified that his medication helped "a little," but did not make him feel less depressed or anxious, and he was unsure whether medication actually made his mood swings less frequent.

5. The Vocational Expert's Hearing Testimony

11

Once Simon had testified, the ALJ posed a series of questions to a vocational expert ("VE") regarding Simon's capacity to work.

First, the ALJ asked the VE to assume a hypothetical person with Simon's medical, educational, and vocational profile who could work at all levels of physical exertion, but was limited to simple tasks, simple decision-making, and only occasionally interacting with others. The VE testified that those limitations would prevent someone from performing Simon's past work—but such a person still could perform light, unskilled work, such as floor waxer, bartender helper, or cook helper.

Next, the ALJ asked the VE to assume a hypothetical person with the same profile as before, but who was limited to only medium levels of exertion. The VE testified that such a person could perform the same jobs listed above.

Finally, the ALJ asked the VE to assume a hypothetical person who suffered from extreme limitations in interacting with others, concentrating, understanding, remembering, or applying information. The ALJ confirmed that this hypothetical was based on Dr. Turner's mental capacities evaluation. The VE testified that such a person could not perform any work in the national economy.

B. The ALJ's Decision

After reviewing all of the evidence and testimony described above, the ALJ denied Simon's claim for disability benefits in a written decision. Consistent with

12

SSA guidelines, the ALJ followed a five-step analysis to determine whether Simon was "disabled" within the meaning of the Social Security Act.

At step one, the ALJ must determine whether the claimant is currently engaging in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Activity is "substantial" if it involves "doing significant physical or mental activities," and it is "gainful" if it is "usually done for pay or profit." Id. § 404.1572(a)-(b). Here, the ALJ found that Simon had not been engaged in "substantial gainful activity" since he stopped working in March of 2014.

At step two, the ALJ must determine whether the claimant suffers from a medically determinable impairment (or a combination of such impairments) that is "severe." Id. § 404.1520(a)(4)(ii). The SSA classifies an impairment as "severe" if it "significantly limits" an individual's ability to perform "basic work activities." Id. § 404.1520(c). Here, the ALJ found that Simon's anxiety and depression qualified as severe.

At step three, the ALJ must determine whether the claimant's impairment (or combination of impairments) "meets or equals" the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix I. Id. § 404.1520(a)(4)(iii). If a claimant's impairments reach that level of severity, then he or she automatically qualifies as "disabled" under SSA regulations. Id. If they do not, then the ALJ must move on to step four. Here, the ALJ found that Simon's psychological

13

impairments did not meet or equal the severity of an impairment listed in SSA regulations and therefore proceeded to step four.

At step four, the ALJ must determine whether a claimant possesses the "residual functional capacity" to perform the job requirements of his or her past work. Id. § 404.1520(a)(4)(iv). SSA guidelines define the term "residual functional capacity" to mean "the most [a person] can still do despite [his or her] limitations." Id. § 404.1545(a)(1). Here, the ALJ found that Simon lacked the residual functional capacity to perform his past work in sales.

At step five, the ALJ must determine whether a claimant can still adjust to any other type of work that exists in substantial numbers in the national economy, given his or her residual functional capacity, age, education, and work experience. Id. §§ 404.1520(a)(4)(v), 404.1560(c)(1). Here, the ALJ found that Simon retained the residual functional capacity to perform "medium work,"[3] provided that his job role was "limited to performing simple routine tasks, making simple work[-]related decision[s], and [only] occasionally interacting with co-workers, supervisors, and the public." Accordingly, the ALJ concluded that Simon was not disabled.

---

[3]    The SSA defines "medium work" as work that requires "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

In reaching that determination, the ALJ gave "little weight" to Dr. Turner's opinions, on the grounds that they were "inconsistent with the longitudinal history." The ALJ then went on to list several portions of the administrative record that he found to be inconsistent with Dr. Turner's opinions, including Simon's own testimony that he could dress himself, feed himself, and go shopping, and including several observations made by Dr. Marban and Dr. Merati during their consultive examinations of Simon. The ALJ relied on notations by Dr. Marban and Dr. Merati like the following:

- that his communication, cooperation, participation, and eye contact were satisfactory;

- that his cognitive functions, abstract reasoning, and executive functions appeared commensurate with his age, socioeconomic status, and education;

- that he exhibited a good fund of information;

- that his ability to solve basic mathematical computations was fair; and

- that he demonstrated fair insight and good judgment.

Based on such observations by the SSA's consulting physicians, the ALJ rejected Dr. Turner's opinion that Simon was unable to handle work-related stress.

The ALJ also gave "little weight" to Dr. Marban's opinions that Simon likely would have trouble with concentration in the workplace, task persistence, and responding appropriately to supervisors. In the ALJ's view, these conclusions were "inconsistent with the doctor's own clinical findings," as well as "other

15

clinical findings . . . showing the claimant is capable of performing unskilled work." The ALJ's decision did not state which of Dr. Marban's findings, specifically, contradicted her overall conclusions. In the preceding paragraph, however, the ALJ had summarized Dr. Marban's evaluation notes and in doing so emphasized the following observations that she made about Simon:

- that his thought processes were goal oriented with no signs of psychosis;

- that he was alert and oriented to person, time, place, and situation;

- that his remote memory was good, his recent memory was poor, and his immediate memory was fair;

- that he exhibited a good fund of information, such as being able to identify the direction that the sun rises, the number of weeks in a year, the capital of Italy, and the continental location of Brazil;

- that he demonstrated good calculation abilities when tested with serial sevens;

- that his abstract reasoning was good;

- that he demonstrated good judgment and insight into his psychological deficits; and

- that he demonstrated sufficient concentration and attention to follow two-step instructions.

As for the "other clinical findings" in the record that purportedly were inconsistent with Dr. Marban's opinions, the ALJ never clarified what those findings were or why they were at odds with Dr. Marban's ultimate assessment.

16

With respect to Simon's hearing testimony, the ALJ stated that "the claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  But here also, the ALJ's decision never specified which evidence was inconsistent with Simon's description of his symptoms, nor did it explain the inconsistency.

Simon appealed the ALJ's decision to the Appeals Council of the SSA, which denied his request for review.

C.  Proceedings in the District Court

Simon promptly sought judicial review of the SSA's adverse decision in the United States District Court for the Southern District of Florida.  He contended that the ALJ's reasons for denying his disability claim were not supported by substantial evidence, nor were they adequately explained.  Simon's case was referred to a magistrate judge, who recommended affirming the agency's decision. The District Court agreed and awarded judgment to the SSA.

Simon timely appealed.

## II.    STANDARD OF REVIEW

When the Appeals Council of the SSA declines to review an ALJ's decision to deny disability benefits, as occurred here, we review that ALJ's decision as the final decision of the SSA's Commissioner.  Doughty v. Apfel, 245 F.3d 1274,

17

1278 (11th Cir. 2001).  We review de novo the legal principles on which the ALJ's decision was based.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  But we review the ALJ's factual findings—including the disability determination itself—only to ensure that they are supported by "substantial evidence."  Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1266-67 (11th Cir. 2015).

In the Social Security context, "substantial evidence" means "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Moore, 405 F.3d at 1211.  Substantial evidence is "less than a preponderance," and thus we must affirm an ALJ's decision even in cases where a greater portion of the record seems to weigh against it.  Id.; see also Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158–59 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence.").  Substantial-evidence review does not permit us to "decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]."  Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (alteration in original) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Within this narrowly limited role, however, the federal courts "do not act as automatons."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  We

retain an important duty to "scrutinize the record as a whole" and determine whether the agency's decision was reasonable.  Id.

## III.  DISCUSSION

The Social Security Act provides various types of insurance benefits to individuals who cannot find work because of a disability.  See 42 U.S.C. § 423(a). The Act defines the term "disability" to mean "[an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).

As described above, the SSA uses a five-step process to decide whether a benefits claimant is disabled.  See 20 C.F.R. § 404.1520.  We are concerned here with the final step, where an ALJ must determine whether the claimant can— despite any physical or mental impairments—obtain and perform any type of work that exists in substantial numbers in the national economy.  Id. §§ 404.1520(a)(4)(v), 404.1560(c)(1).

When making this assessment, the ALJ must give special attention to the opinions of a claimant's treating physician.  Indeed, SSA regulations in force at the

19

time Simon filed his application required an ALJ to give "controlling weight" to a treating physician's opinions if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).[4]  And our own case law is clear that a treating physician's conclusions must be given "substantial or considerable weight" unless there is "good cause" to discount them. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  "Good cause" exists where "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1241.

While an ALJ may choose to reject a treating physician's findings when there is good cause, "he 'must clearly articulate [the] reasons' for doing so." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (alteration in original) (quoting Phillips, 357 F.3d at 1240–41).  If the ALJ fails to state reasonable grounds for discounting such evidence, we will not affirm "simply

---

[4]    The regulation quoted above only applies to disability claims that were filed before March 27, 2017.  Claims filed after that date are governed by a new regulation prescribing a somewhat different framework for evaluating medical opinions.  See 20 C.F.R. § 404.1520c. Because Simon filed his claim in March of 2015, we need not and do not consider how the new regulation bears upon our precedents requiring an ALJ to give substantial or considerable weight to a treating physician's opinions absent good cause to do otherwise.

because some rationale might have supported the ALJ's conclusion." Id. (quoting Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984)).  It is the responsibility of the agency, not the reviewing court, to supply the justification for its decision and to sufficiently explain "the weight [it] has given to obviously probative exhibits." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (quoting Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979)).

Simon's primary argument on appeal is that the ALJ failed to state good cause to discount the opinions of his treating psychiatrist, Dr. Turner.  We agree, and that error alone is enough to require that we remand.  See Lewis, 125 F.3d at 1440 ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.").  We therefore address that issue first.

### A. The ALJ's Rejection of Dr. Turner's Opinions

As described in more detail above, Dr. Turner's treatment notes were extensive, spanning more than thirty meetings with Simon across four years. Throughout that considerable length of time, Dr. Turner regularly wrote that Simon was displaying severe symptoms of mental illness, such as frequent panic attacks, uncontrollable racing thoughts, volatile mood swings, paranoia about leaving his home, and self-isolation from friends and family.  On the whole, Dr. Turner's records indicate that Simon suffers from very serious psychiatric disorders, ones

21

that she concluded would significantly impair his ability to function under stress, maintain focus, or interact appropriately with others in a work setting.

The ALJ ultimately chose to give little weight to Dr. Turner's opinions, on the grounds that they were inconsistent with: (1) Simon's "longitudinal history," (2) certain observations made by the SSA consultants who examined Simon, and (3) Simon's testimony that he was able to carry out certain daily tasks such as grooming himself and grocery shopping. In our view, however, the ALJ's decision did not adequately explain how any of these pieces of evidence were inconsistent with Dr. Turner's opinions or otherwise constituted good cause to disregard her conclusions.

As an initial point, it is not immediately clear to us what the ALJ meant when referring to Simon's "longitudinal history." SSA guidelines do not specifically define that term. Instead, the agency simply advises claimants that it "will request longitudinal evidence of your mental disorder when your medical providers have records concerning you and your mental disorder *over a period of months or perhaps years*." 20 C.F.R. § 404, Subpart P, Appendix I (emphasis added). This suggests that, in Simon's case, the ALJ's reference to the "longitudinal history" was intended to refer to Dr. Turner's treatment notes,[5] and

---

[5]    Dr. Turner was the only physician who kept records of Simon's mental disorders over an extended period of time.

the parties both seem to agree.  We therefore read the ALJ's decision as concluding that Dr. Turner's opinions as to the severity of Simon's impairments were inconsistent with her own treatment notes.

However, after scrutinizing Dr. Turner's treatment notes and examining the ALJ's reasons for finding them inconsistent with her overall opinions, we find no obvious inconsistency.  To the contrary, Dr. Turner's records stated time and again that Simon was experiencing intense symptoms from his conditions.  Yet any mention of Simon's most serious symptoms is conspicuously missing from the ALJ's decision, which summarized Dr. Turner's findings as follows:

> [T]he claimant received treatment from Rosa Fernandez Turner, M.D. []
> He has reported feeling anxious and depressed, and having difficulty
> concentrating.  His symptoms included anhedonia, decreased energy,
> decreased motivation, decreased sleep, and feelings of hopelessness and
> helplessness.  On June 12, 2014, July 14, 2014, November 13, 2014,
> April 27, 2015, and June 20, 2016, it was noted that the claimant was
> doing well on his medications and did not report any side effects [].

Nowhere in this paragraph, which was the only part of the decision that discussed Dr. Turner's treatment notes at all, did the ALJ address Simon's panic attacks, racing thoughts, mood swings, outbursts of anger, memory problems, paranoia, or his shutting himself off from others.  Instead, the ALJ only listed Simon's relatively minor symptoms, while at the same time emphasizing the sections of Dr. Turner's notes that described Simon as stable on his medications.  This complete failure to engage with significant portions of Dr. Turner's clinical

findings, which verges on a blatant mischaracterization of Simon's medical records, was error.

It was also error to conclude that Dr. Turner's occasional references to Simon being "stable on medication" were inconsistent with a finding of debilitating mental illness. Many mental disorders—and bipolar disorder in particular—are characterized by the unpredictable fluctuation of their symptoms, and thus it is not surprising that even a highly unstable patient will have good days or possibly good months. See Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011) ("The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated."). Indeed, in another case also involving a claimant diagnosed with bipolar disorder, we explicitly "agree[d] with our sister [c]ircuits that people with chronic diseases can experience good and bad days." Schink v. Comm'r of Soc. Sec., 935 F.3d 1245, 1267 (11th Cir. 2019). For those who suffer from such disorders, "a snapshot of any single moment says little about [a person's] overall condition," and an ALJ who relies on such snapshots to discredit the remainder of a psychiatrist's findings demonstrates a "fundamental, but regrettably all-too-common, misunderstanding of mental illness." Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011). Accordingly, this Court has held that it was improper for an ALJ to dismiss

24

a psychiatrist's treatment notes as "indicat[ing] only mild limitations . . . at best" simply because "some of [the claimant's] mental-status examinations were better than others." Schink, 935 F.3d at 1262.

As noted above, the opinion evidence of Dr. Turner diagnoses Simon with a severe combination of bipolar disorder, depression, and anxiety, accompanied by symptoms considerably more serious than those acknowledged by the ALJ. These conditions, in Dr. Turner's opinion, imposed significant limitations on Simon's mental and social functioning. We conclude that isolated entries in Dr. Turner's treatment notes indicating that Simon was at times stable on his meds, without more, cannot constitute or contribute to good cause to reject Dr. Turner's opinions.[6]

We now turn to the ALJ's second basis for discounting Dr. Turner's opinions—the ALJ's belief that several observations made by the SSA's consulting doctors were inconsistent with Dr. Turner's assessment of Simon's condition. The ALJ relied on the following notations by Dr. Marban and Dr. Merati:

- that Simon displayed satisfactory communication, cooperation, participation, and eye contact;

- that Simon had a "grossly intact" memory;

- that Simon exhibited good calculation abilities when tested with serial sevens;

---

[6]    Moreover, as noted above, most of these entries were accompanied by a clarification that significant symptoms continued.

- that Simon had good cognitive function, executive function, thought processes, and abstract reasoning;

- that Simon had a good fund of information; and

- that Simon displayed fair insight and good judgment.

The ALJ found that these observations were inconsistent with Dr. Turner's findings and warranted giving her opinions "little weight." We disagree.

Before an ALJ may reject a treating physician's opinions as inconsistent with other medical findings in the record, he or she must identify a "genuine" inconsistency. Id. (citing Lewis, 125 F.3d at 1440). "It is not enough merely to point to positive or neutral observations that create, at most, a trivial and indirect tension with the treating physician's opinion by proving no more than that the claimant's impairments are not all-encompassing." Id. at 1263. Consequently, when a claimant has been diagnosed with the types of mental and emotional disorders at issue here, highly generalized statements that the claimant was "cooperative" during examination, that he exhibited "organized speech" and "relevant thought content," or that he showed "fair insight" and "intact cognition," ordinarily will not be an adequate basis to reject a treating physician's opinions. Id. at 1262. Nor is it enough to say that the claimant is "intelligent enough to understand and follow orders and to solve problems," such as serial sevens,

26

because "highly intelligent and able people do fall prey to crippling depression." MacGregor, 786 F.2d at 1053–54.

Furthermore, when evaluating a claimant's medical records, an ALJ must take into account the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of a workplace. As the Third Circuit has observed, "[f]or a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000). Thus, "it is not inconsistent—or even that unlikely—that a patient with a highly disruptive mood disorder, in a structured one-on-one conversation with a mental-health professional, might be capable of 'be[ing] redirected' from his 'tangential' thought processes so as to 'remain on topic.'" Schink, 935 F.3d at 1263 (alteration in original); see also Castro v. Acting Comm'r of Soc. Sec., 783 F. App'x 948, 956 (11th Cir. 2019) ("Without more, we cannot say that [the treating physician's] observations of Castro's judgment, insight, thought process, and thought content in a treatment environment absent work stressors were inconsistent with his assessments about the limitations she would face in a day-to-day work environment.").

In this case, we cannot discern—and the ALJ did not attempt to explain— how any of Dr. Marban's or Dr. Merati's findings are genuinely inconsistent with

27

Dr. Turner's opinions. For example, Simon's ability to solve basic math problems says little to nothing about his ability to perform simple tasks on a full-time basis, his ability to respond appropriately to the stress of customary work pressures, his ability to interact with others in the workplace, or his ability to concentrate, persist, and maintain pace. Similarly, the fact that Simon can communicate, maintain eye contact, and follow simple instructions during a mental-health evaluation does not have any obvious bearing on his mood swings, his panic attacks, his outbursts of anger, or his fear of leaving his home. And while Dr. Merati did describe Simon's memory as "grossly intact," Dr. Marban's more detailed evaluation rated his "recent memory" as "poor," which is consistent with a conclusion that Simon would have difficulties remembering work-related instructions.[7] We therefore conclude that capabilities like the foregoing observed during consultive examinations, without more, did not constitute or contribute to good cause to reject Dr. Turner's opinions.

---

[7]      We also note that Dr. Merati is not a mental-health professional, which of course bears significantly on the weight to be accorded to her opinion. See 20 C.F.R. § 404.1527(c)(5) (requiring an ALJ to "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist").Dr. Merati's role in the SSA proceedings was to conduct a physical examination—not a psychiatric one. Any findings she made regarding Simon's mental condition at that time were merely incidental to the main purpose of the exam and were not within her area of expertise. However, in light of our disposition of this case, we need not comment on the appropriate weight owed to Dr. Merati's incidental observations.

For largely the same reasons, the ALJ's final basis for discounting Dr. Turner's opinions was not sufficient. Specifically, the ALJ found it significant that Simon could feed himself, dress himself, and shop. But here again, the ALJ failed to identify any genuine inconsistency with Dr. Turner's findings. In our view, it goes almost without saying that many people living with severe mental illness are still capable of eating, putting on clothes in the morning, and purchasing basic necessities. None of those activities, however, say much about whether a person can function in a work environment—with all of its pressures and obligations—on a sustained basis. Without some reasonable explanation from the ALJ as to why completing basic household chores is inconsistent with a finding of disability, this evidence was not sufficient to discredit Dr. Turner.

In summary, we hold that the ALJ failed to articulate good cause to reject the opinions of Simon's treating physician. The ALJ pointed to no genuine inconsistencies between Dr. Turner's opinions and her treatment notes, the other medical evidence from Dr. Marban and Dr. Merati, or Simon's own testimony. Our holding in this regard is sufficient by itself to require remand.

B.  The ALJ's Rejection of Dr. Marban's Opinions

Although the ALJ's improper treatment of Dr. Turner's opinions is enough on its own to necessitate remand, we believe it important to also note our agreement with Simon that the ALJ erred in giving "little weight" to Dr. Marban's

29

opinions.  Dr. Marban concluded that, in a workplace setting, Simon likely would have trouble with concentration, task persistence, accepting instructions from others, or responding appropriately to supervisors.  The ALJ chose to disregard those opinions, however, on the grounds that they were "inconsistent with the doctor's own clinical findings and other clinical findings discussed further in this decision showing the claimant is capable of performing unskilled work."  We find this explanation to be insufficient.

In discounting Dr. Marban's opinions, the ALJ relied on the same kinds of capabilities, observed by Dr. Marban and Dr. Merati in their consultive examinations of Simon, that he also relied on to discount Dr. Turner's opinions.  As discussed above, such capabilities—e.g., a good fund of information, fair insight, good judgment, good calculation abilities, and good abstract reasoning— say little to nothing about the capacity to work of a person suffering from the types of mental illnesses with which Simon was diagnosed.  And in our view, it scarcely even needs to be explained that knowing such things as the direction in which the sun rises has almost no relevance to a person like Simon's ability to function in a workplace on a sustained basis.  Thus, for the same reasons that these capabilities did not constitute or contribute to good cause to discount Dr. Turner's opinions, they cannot constitute a reasonable basis for discounting Dr. Marban's opinions.

30

As for the "other clinical findings" that the ALJ found to be inconsistent with Dr. Marban's opinions, we cannot say with any certainty what those findings were because the ALJ's decision did not list them. We know that the ALJ did not rely on the opinions of Dr. Grubbs and Dr. Bercik because the ALJ's decision explicitly accorded them little weight. But in any event, "[n]on-examining physicians' opinions are entitled to little weight when they contradict opinions of examining physicians and do not alone constitute substantial evidence." Schink, 935 F.3d at 1260. The ALJ's decision does not refer to any other medical evidence relevant to the limitations imposed by Simon's mental disorders.

For these reasons, we conclude that the ALJ failed to articulate reasonable grounds for giving Dr. Marban's opinions little weight.

C.   The ALJ's Rejection of Simon's Testimony

Third and finally, we conclude that we must vacate the ALJ's finding that Simon's testimony regarding "the intensity, persistence and limiting effects of [his] symptoms" was "not entirely consistent with the medical evidence and other evidence in the record."[8]

At his hearing before the ALJ, Simon testified: (1) that his concentration issues and memory problems made it difficult for him to complete certain tasks,

---

[8]    Once again, the ALJ did not elaborate on which portions of the medical evidence (or "other evidence") were inconsistent with Simon's statements, thus making it difficult for us to review this finding.

such as paying bills or remembering which items to pick up from the grocery store; (2) that he had attempted suicide and no longer cared whether he was alive or dead; (3) that he experienced mood swings nearly every day; (4) that his depression caused him to isolate himself from others; and (5) that he was afraid of going outside and would not leave his house except for a few select locations. All of this—and much more—is also recorded in Dr. Turner's treatment notes, and Simon reported most of these same symptoms in his examinations with Dr. Marban and Dr. Merati, both of which occurred several years before his SSA hearing.

In any event, because we have vacated the ALJ's decision to discount the opinions of Dr. Turner and Dr. Marban, the medical evidence considered on remand may well be different. Accordingly, the ALJ will need to reassess Simon's testimony as well. If, after giving each medical opinion in the record appropriate weight, the ALJ is still inclined to disbelieve Simon's statements as to the severity of his symptoms, then the ALJ must support that finding by identifying some specific portion of the record undermining Simon's credibility.

## IV. CONCLUSION

For the foregoing reasons, we hold that the SSA's denial of Simon's application for disability benefits was not supported by substantial evidence. Accordingly, we reverse the judgment of the district court with instructions to remand to the agency for further proceedings consistent with this opinion.

REVERSED AND REMANDED.