[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13175

Non-Argument Calendar

_____

BENJAMIN MORALES, JR.,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00724-GKS-DCI

_____

Before WILSON, LUCK, and HULL, Circuit Judges.

PER CURIAM:

Benjamin Morales, Jr., appeals the district court's order affirming the Social Security Administration ("SSA") Commissioner's denial of his application for supplemental security income ("SSI").  After review, we affirm the district court's order.

## I.    BACKGROUND

### A.    Morales's Application

On November 29, 2016, Morales applied for SSI, alleging that he was disabled since January 16, 2016.  He later amended the alleged onset date to November 29, 2016, the date of his application.

After the SSA denied Morales's claim, Morales requested a hearing before an administrative law judge ("ALJ").  On May 16, 2019, the ALJ held a hearing, heard testimony from Morales, and reviewed extensive medical records.  We outline the relevant evidence.

### B.    Morales's Testimony

Morales testified that he was an unemployed, 48-year-old high school graduate.  Morales lived at home with his mother and his three-year-old son.  Morales explained that he had tried to find work but stopped looking because he was never hired.

Morales had back problems due to his former profession as a break dancer, which caused stenosis, lumbar problems, and neck problems.  Morales had a lot of back spasms with pain that spread to his arms and legs.  He was using a walking cane for about a year and a half to take pressure off of his back.  He took hydrocodone three times per day for his back pain, but it was not very effective because it reduced his pain from a ten to only a seven or eight on a ten-point scale.

Morales woke up every morning with crying spells due to his depression.  Morales had two or three panic attacks each day, even though he regularly took medication for anxiety.  Because of his back problems and anxiety, Morales could sleep for only about six hours on a good night and four hours or less on a bad night.  He got headaches about four times per week, each lasting about 30 or 40 minutes.

Morales could not lift his son, and his epilepsy made him afraid to carry his son.  He did his own laundry but could not carry a full laundry basket.  He sometimes drove, but his anxiety prevented him from driving much.  Typically, he stayed in his room and watched television. Morales had friends who would visit him, but he would not go out to social activities.  He regularly attended religious services with his mother, but he struggled to sit for long periods of time.

## C.    Vocational Expert's ("VE") Testimony

The ALJ posed two hypotheticals to the VE who testified. First, the ALJ asked the VE whether there would be jobs in the national economy for a person who (1) is able to perform at the "light" exertional level; (2) could never climb ladders, ropes, or scaffolds; (3) could occasionally climb ramps or stairs; (4) could occasionally balance, stoop, kneel, crouch, or crawl; (5) could have no exposure to excessive vibration, unprotected heights, or hazardous machinery; (6) was limited to simple routine tasks with only occasional interaction with the public and coworkers; (7) had "no production quota"[1]; (8) had only occasional supervision; and (9) was limited to low-stress work, with only occasional decision-making and occasional changes in the work setting. The VE responded that there would be jobs in the national economy with those limitations, including (1) a cafeteria attendant[2]; (2) a cleaner/housekeeper; and (3) a folder.

Second, the ALJ asked the VE the same hypothetical with the same limitations, except the ALJ reduced the exertional limitation to "sedentary." The VE testified that this individual could perform work as (1) an address clerk; (2) a table worker; and

---

[1] The ALJ clarified that by "no production quota," he meant "no strict production standard and no rigid production pace, such as an automated line outside the worker's control."

[2] Later, the VE clarified that, although the cafeteria attendant position required being in public, it did not require interaction with the public.

(3) a sorter.  The VE stated that there would be a few other jobs, but one or more absences per month would preclude work by the seventh month.

The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion publications.  The VE acknowledged that the limitations for interactions with the public and coworkers and the "fast-paced production rate" were not addressed by the DOT.  Thus, the VE had relied on her experience and training as a vocational counselor to identify jobs meeting the limitations in the two hypotheticals.

## D.    Medical History for Morales's Mental Impairments

From 2012 to 2019, Morales regularly sought mental health treatment from Impower providers.  Morales's June 2012 intake form noted a Global Assessment of Functioning ("GAF") score of 48 and diagnoses of depressive disorder, bipolar II disorder, and seizures.[3]

---

[3] The GAF is a numeric scale (0 through 100) intended to rate the psychological, social, and occupational functioning of adults.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32–33 (4th ed. 2000).  Scores between 51 and 60 indicate moderate difficulty in functioning, whereas lower scores between 41 and 50 indicate serious difficulty in functioning.  *Id.* at 34.

As noted later, both the 2013 and 2022 versions of the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* no longer use GAF scores for several reasons, including their inconsistent nature due to the lack of standardization.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013); American Psychiatric

6                    Opinion of the Court                21-13175

From April to August 2016, Morales saw Impower psychiatrist Najib Kirmani, M.D., three times for mental health treatment.  At the April 2016 visit, Dr. Kirmani assigned him a GAF score of 65.  In June 2016, Dr. Kirmani reported that Morales's mood had improved, and in August 2016, Dr. Kirmani noted Morales's mood was stable.

In September 2016, Morales saw an Impower counselor and reported struggling with being impulsive, angry, nervous, and anxious and having mood swings.  The counselor assigned him a GAF score of 60.

In June 2017, Morales saw Dr. Kirmani again after his father passed away.  Dr. Kirmani prescribed a new medication and assigned a GAF score of 48.

In July 2017, Morales saw Impower psychiatrist Kazi Ahmad, M.D.  Morales reported feeling tense and irritable, lashing out, screaming, and punching walls.  Dr. Ahmad diagnosed him with intermittent explosive disorder, added a new prescription, and assigned him a GAF score of 48.

Later that month, Morales met with an Impower counselor about his ongoing anxiety and depression, and the counselor assigned him a GAF score of 60.

---

Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. text rev. 2022).

In August 2017, Morales saw Dr. Ahmad again and reported feeling less anxiety and denied feeling tension, irritability, and depression. Despite these improvements, Dr. Ahmad assigned him a GAF score of 48.

Morales was assigned a GAF score of 48 during his visits on the following dates: December 20, 2017; December 28, 2017; January 23, 2018; February 20, 2018; March 20, 2018; April 9, 2018; May 7, 2018; June 12, 2018; July 2, 2018; July 30, 2018; August 20, 2018; October 19, 2018; November 12, 2018; December 4, 2018; December 31, 2018; January 21, 2019; February 14, 2019; March 14, 2019; and April 11, 2019. During that same time, however, a counselor assigned Morales a GAF score of 60 on April 10, 2018 and 65 on July 14, 2018.

## E.    Medical History for Morales's Physical Impairments

From November 2015 to January 2017, Morales regularly saw primary care physician Son Chau, M.D., and nurse practitioner Lindsay Marlene, ARNP. They assessed Morales as having chronic pain, prescribed pain medication, and referred Morales for physical therapy and to a neurosurgeon.

In April 2016, Morales had an MRI of both his cervical spine (i.e., neck area) and lumbar spine (i.e., back area). For the April 2016 cervical spine MRI, there are no results listed for C1-C2, but the results for the rest of the intervertebral discs and motion segments showed the following:

8                          Opinion of the Court                    21-13175

C2-C3:     No significant disc bulge or protrusion is identified. No significant facet osteoarthropathy or canal or foraminal stenosis is noted.

C3-C4:     No significant disc bulge or protrusion is identified. Mild left foraminal stenosis and facet arthropathy. No right foraminal or central canal stenosis.

C4-C5:     Right paracentral disc protrusion and subjacent thin spondylitic ridge. **Moderate right foraminal stenosis**. No left foraminal stenosis. Mild central spinal stenosis. No facet abnormality.

C5-C6:     No significant disc bulge or protrusion is identified. Mild left foraminal stenosis. No right foraminal or central canal stenosis.

C6-C7:     Left medial foraminal disc protrusion. Mild left foraminal stenosis. No right foraminal or central canal stenosis.

C7-T1:     No significant disc bulge or protrusion is identified. No significant facet osteoarthropathy or canal or foraminal stenosis is noted.

(Emphasis added.)  And the April 2016 lumbar spine MRI showed the following:

L1-L2:      No significant disc bulge or protrusion is identified.      No    significant    facet osteoarthropathy  or  canal  or  foraminal stenosis is noted.

L2-L3:      No significant disc bulge or protrusion is identified.      No    significant    facet osteoarthropathy  or  canal  or  foraminal stenosis is noted.

L3-L4:      Desiccation of the disc.  Mild retrolisthesis. Mild disc bulge.  No spinal stenosis.  Mild bilateral foraminal stenosis.  No significant facet or ligamentum flavum hypertrophy.

L4-L5:      Mild disc bulge.  No spinal stenosis.  Mild bilateral  foraminal  stenosis.    There  is bilateral facet hypertrophy.

L5-S1:      Mild retrolisthesis.  There is desiccation of the disc with disc space narrowing.  There is a  focal  central  protrusion  encroaching upon  the  ventral  sac  of  the  thecal  sac. There is mild spinal stenosis.  Mild bilateral foraminal stenosis.  There is no significant facet or ligamentum flavum hypertrophy.

In June 2017, Morales saw primary care physician Bella Dattani, M.D., for a consultative examination at the request of a State agency.  Dr. Dattani reviewed Morales's April 2016 cervical and lumbar spine MRIs and his treatment notes.  Dr. Dattani noted that Morales was "generally healthy with no deficits" and had no stiffness, pain, or tenderness in his neck.  Dr. Dattani recorded that (1) her examination of Morales's cervical spine revealed no tenderness of the spinous process or evidence of paravertebral muscle spasms near the cervical spine and (2) her examination of Morales's dorsolumbar spine showed no paravertebral spasms on the lumbar spine or tenderness over the spinous process.

In November 2018, Morales saw Dr. Chau again about his neck and back pain getting worse.  Dr. Chau noted that Morales reported his symptoms of cervical problems were getting worse, and Dr. Chau ordered an MRI of the cervical spine.

In January 2019, Morales had an MRI of his cervical spine, which showed the following:

C1-C2:    Mild osteoarthritis between anterior arch of C1 and the odontoid process.

C2-C3:    There is no disc protrusion.  No central canal stenosis.  No neural foraminal narrowing.

C3-C4:    Mild concentric disc bulge measuring 1-2 mm in AP extent.  There is no disc

protrusion.  No central canal stenosis.  No neural foraminal narrowing.

C4-C5:    Mild concentric disc bulge measuring 1-2 mm in AP extent.  **There is severe right neural foraminal narrowing related to uncovertebral joint arthritis.**  Mild central canal narrowing.    No significant left foraminal stenosis or facet arthropathy.

C5-C6:    Mild concentric disc bulge measuring 1-2 mm in AP extent.   Mild left foraminal stenosis.  No right foraminal stenosis.  No facet arthropathy.

C6-C7:    There is no disc protrusion.  No central canal stenosis.    No neural foraminal narrowing.

C7-T1:    There is no disc protrusion.  No central canal stenosis.    No neural foraminal narrowing.

(Emphasis added.)

The differences between the April 2016 cervical spine MRI and the January 2019 cervical spine MRI are twofold.  First, several parts of Morales's cervical spine improved.  Unlike the April 2016 cervical spine MRI, the January 2019 cervical spine MRI showed (1) no mild bilateral foraminal stenosis at C3-C4, (2) no spondylitis

issues at C4-C5, (3) no mild left foraminal stenosis at C6-C7, and (4) no left medial foraminal disc protrusion at C6-C7. Second, though, it indicated new mild concentric disc bulges at C3-C4 and C5-C6 and the right foraminal stenosis at the C4-C5 level changed from moderate to severe.

In February, March, and April 2019, Morales saw primary care physician, Jose Sosa, M.D., for a physical examination because of neck and back pain. At the first visit in February 2019, Dr. Sosa noted "neck pain to movement," but he did not do so at subsequent visits.

Notably, at all three visits, Dr. Sosa's examinations revealed a supple neck with normal range of motion and normal neurological findings related to motor strength and sensation.

## F.    The ALJ's Decision

Eligibility for SSI benefits requires that the claimant be disabled. 20 C.F.R. § 416.912(a). To determine whether a claimant is disabled, the ALJ engages in a five-step process. *Id.* § 404.1520(a). Following the five-step process, the ALJ determined that:

1.    Morales had not engaged in substantial gainful activity since his alleged onset date in November 2016;

2.    Morales had four severe impairments: generalized anxiety disorder; major depressive disorder/bipolar disorder; intermittent explosive disorder; and degenerative disc disease of the cervical and lumbar spine;

3.    Morales's impairments, either alone or in combination, did *not* meet the criteria of any of the listed impairments;

4.    Morales had the residual functional capacity ("RFC") to perform a range of light work, with certain restrictions; and

5.    Morales had no past relevant work, and considering Morales's age, education, work experience, and RFC, three jobs—cafeteria attendant, cleaner/housekeeper, and folder—existed in the national economy that he could perform.

With respect to Morales's RFC (step four, noted above), the ALJ found that Morales could (1) lift up to 20 pounds occasionally, (2) lift and carry up to 10 pounds frequently, and (3) stand and walk with normal breaks for about six hours in an eight-hour workday. The ALJ also found that Morales could never climb ladders, ropes, or scaffolds and could not have any exposure to excessive vibration, unprotected heights, or hazardous machinery, but he could occasionally climb ramps and stairs and occasionally balance, stoop, kneel, crouch, and crawl. The ALJ found that Morales could perform simple, routine tasks in a low-stress job and that "such work c[ould] have no production quota (e.g., no strict production standard and no rigid production pace, such as an automated line that the worker cannot control)."

Also at step four, the ALJ summarized Morales's testimony and found that Morales's impairments could reasonably be expected to cause his alleged symptoms but that his statements

about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ reviewed Morales's mental health treatment history and concluded that Morales's "mental impairments, while severe, [were] largely controlled by psychotropic medication and therapy."

The ALJ stressed that in multiple examinations in 2019, Morales "was medication compliant without side effects, and that [his] anxiety was manageable, denied pain, and had good sleep and normal energy." The ALJ noted that on some occasions, Morales's mental health providers gave him various GAF scores. The ALJ gave these GAF scores little weight and explained why:

> GAF scores, as a general matter, do not describe specific work[-]related limitations or objective mental abnormalities. They consider psychological, social[,] and occupational functioning whereas Social Security is primarily concerned with occupational functioning. Moreover, since they reflect the individual clinician's judgment, scoring can vary considerably from practitioner to practitioner. Further, they typically represent current functioning, not longitudinal functioning over 12 continuous months. . . . Consistent with the above observations, *the latest version of the* Diagnostic and Statistical Manual of Mental Disorders . . . *no longer utilizes GAF scores because of their "conceptual lack of clarity" and "questionable psychometric in routine practice."*

(Emphasis added.)

In reviewing Morales's medical history, the ALJ concluded Morales had "some spine issues, [but] his seizure disorder and hyperlipidemia seem[ed] relatively controlled."  To support his RFC determinations, the ALJ summarized the findings in Morales's April 2016 MRI of his cervical and lumbar spine.  The ALJ did not explicitly reference or discuss the January 2019 cervical spine MRI or its findings about Morales's neck area.  However, the ALJ pointed out that, as recently as April 2019, Dr. Sosa had indicated Morales was not in acute distress, exhibited normal range of neck motion with no pain noted, and had normal motor strength.

At step five, the ALJ noted that Morales could not perform a full range of light work, and thus the ALJ relied on the VE's testimony as to the existence of unskilled jobs—cafeteria attendant, cleaner/housekeeper, and folder—that an individual with Morales's restrictions could perform.  The ALJ "determined that the [VE's] testimony [was] consistent with the information contained in the DOT."  The ALJ acknowledged the VE's explanation that because "the DOT did not address absences or being off-task, interactions with co-workers and the public, or fast-paced production," the VE had relied on her experience and training on these issues.

Ultimately, the ALJ determined that Morales was "not disabled" and thus did not qualify for SSI.

## G.    Appeals Council

Morales appealed the ALJ's decision to the Appeals Council, which denied his request for review on March 2, 2020.

## H.    District Court Proceedings

On April 27, 2020, Morales sought review of the Commissioner's final decision in the district court. A magistrate judge recommended that the Commissioner's decision be reversed and remanded. The district court rejected the magistrate judge's report and recommendation and affirmed the Commissioner's decision. Morales timely appealed.

## II.    STANDARD OF REVIEW

Our review in a social security case is the same as that of the district court. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). We review de novo the legal principles on which the ALJ's decision was based. *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1103 (11th Cir. 2021). But "[w]e may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Rather, we must defer to the Commissioner's decision if it is supported by substantial evidence. *Id.* "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* "If the Commissioner's decision is supported by substantial evidence[,] we must affirm,

even if the proof preponderates against it." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

## III.   DISCUSSION

On appeal, Morales argues (1) the ALJ's decision was not supported by substantial evidence because the ALJ failed to consider his January 2019 cervical spine MRI; (2) the ALJ improperly gave little weight to his GAF scores; and (3) the ALJ erred by failing to resolve inconsistencies between the VE's testimony and the DOT.  We address each argument in turn.

### A.   January 2019 Cervical Spine MRI

Morales argues that the ALJ erred by failing to consider his January 2019 cervical spine MRI, which showed "severe" right foraminal stenosis at the C4-C5 level.  Relying on *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981), Morales stresses that ALJs are required to explain the weight accorded to "obviously probative" exhibits.  And, according to Morales, the January 2019 cervical spine MRI is an "obviously probative" exhibit.

On the other hand, the Commissioner emphasizes that *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005), says "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."  So, according to the Commissioner, the ALJ did not err because the ALJ clearly considered Morales's neck condition as a whole.

The Commissioner also argues *Cowart* does not apply to the facts of Morales's case.   In *Cowart*, the claimant was

unrepresented, and the Court explained that, under those circumstances, an ALJ's "basic obligation to develop a full and fair record rises to a special duty," which "requires the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." 662 F.2d at 735 (quotation marks omitted). The Court concluded the ALJ in *Cowart* failed to fully and fairly develop the record, in part, by not providing and explaining the weight he accorded to the various testimony he considered. *Id.* The Commissioner contends that because Morales was represented at the administrative level, the ALJ had no special duty like the ALJ in *Cowart* to state specifically the weight accorded to "obviously probative" exhibits and why he reached that decision.

We need not resolve this debate. We assume—without deciding—that (1) the January 2019 cervical spine MRI was an "obviously probative" exhibit and (2) the ALJ erred by not discussing or explaining the weight given to that MRI. But such an error—which, again, we are assuming to have occurred—was harmless in light of all the medical evidence. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error review to an ALJ's determination that a claimant was not disabled).

The ALJ found Morales's severe impairments, including degenerative disc disease of the cervical spine, significantly limited his ability to perform basic work activities and, as a result, imposed greater limitations in determining Morales's RFC. The ALJ extensively reviewed Morales's medical records and the medical

opinion evidence, in which most of his treating medical providers' examinations noted normal findings of the musculoskeletal system and specifically that Morales had suppleness and full range of motion in his neck, frequently reported no neck pain, and was not in any acute distress. Similarly, Morales's exam with consulting physician Dr. Dattani revealed full range of motion in Morales's neck and no tenderness of the spinous process or evidence of paravertebral muscle spasms near the cervical spine.

And, after Morales's January 2019 cervical spine MRI, Dr. Sosa examined Morales in February, March, and April 2019. Although at two visits Morales complained of neck and back pain, Dr. Sosa, like Morales's previous medical providers, noted generally normal examination results, including a supple neck with full range of motion. And Dr. Sosa noted "neck pain to movement" at the February 2019 visit, but he did not do so at subsequent visits. In other words, despite the change to the right foraminal stenosis at the C4-C5 level, Dr. Sosa observed substantially the same findings as prior medical providers had observed before the January 2019 cervical spine MRI.

Further, as noted above, the January 2019 cervical spine MRI is arguably less favorable to Morales because several of Morales's conditions improved. Indeed, the only unfavorable change Morales specifically identified is that his right foraminal stenosis at the C4-C5 level had worsened from "moderate" to "severe."

Lastly, while the ALJ did not explicitly discuss the January 2019 cervical spine MRI in his decision, the hearing transcript

shows the ALJ introduced Exhibit B16F into the record, and the ALJ specifically referred to the January 2019 cervical spine MRI on page 34 of that exhibit.

Under the totality of these circumstances, we conclude the January 2019 cervical spine MRI would not have altered the ALJ's handling of Morales's statements of the intensity, persistence, and limiting effects of his neck pain or the ALJ's RFC determination. As such, any error on the ALJ's part in failing to specifically weigh the January 2019 cervical spine MRI was harmless.

## B.    GAF Scores

Next, we consider Morales's argument that the ALJ improperly gave little weight to his GAF scores. According to Morales, the ALJ's statement that his GAF scores were unreliable was boilerplate and nonspecific.

We readily conclude the ALJ did not err in assigning Morales's GAF scores "little weight." The ALJ stated with particularity the reasons for giving Morales's GAF scores little weight: He reasoned that GAF scores are subjective and not pertinent to a legal determination about disability.

Both the SSA and this Court have recognized the subjective nature and unreliability of GAF scores and emphasized GAF scores are not dispositive when determining disability. *See* U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (July 22, 2013) REV (Oct. 14, 2014) REV 2 (Mar. 27,

2017) (both the 2013 and 2017 versions highlighting multiple problems with using GAF scores to evaluate disability, observing that GAF scores lack standardization, and stating that a GAF rating alone is never dispositive of impairment severity); *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1266 (11th Cir. 2019) ("We recognize that GAF scores are by no means dispositive of a claim . . . ."); *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 471 (11th Cir. 2016) (unpublished) (recognizing that "[a] GAF score is a subjective determination").

And, as the ALJ noted, the *Diagnostic and Statistical Manual of Mental Disorders* no longer uses GAF scores because of their "conceptual lack of clarity" and "questionable psychometrics in routine practice."    *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013); *see also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. text rev. 2022) (recognizing GAF scores are no longer used).

Moreover, the ALJ's reasons for giving little weight to Morales's GAF scores were supported by the record.  From 2012 to 2019 Morales's GAF score remained mostly at 48, even when mental status examinations showed normal findings and treatment notes detailing his progress showed improvement with medication and therapy.  As an example, on July 31, 2017, an Impower counselor assigned Morales a GAF score of 60, but the next month on August 24, 2017, his GAF score decreased to 48 even though Morales (1) reported he was "doing well" and feeling less anxious

and (2) denied feeling tension, irritability, and depression. Similarly, between December 2017 and April 2018, Morales regularly received a GAF score of 48, but then on April 10, 2018, a provider assigned him a GAF score of 60.

Finally, as the ALJ explained, Morales's records of psychiatric treatment between 2012 and 2019 indicated that Morales's mental impairment was largely controlled by medication and therapy.  Despite Morales's diagnoses and his reported issues with impulsivity, anger, anxiety, and depression, by 2019 Morales reported to his mental health providers that his anxiety was manageable, he denied having panic attacks, and he reported good sleep and normal energy.  In light of the ALJ's thorough consideration of Morales's treatment notes from mental health providers showing Morales's improvement, the ALJ did not err by giving Morales's GAF scores little weight based on their subjective and unreliable nature.

## C.    VE's Testimony and the DOT

Lastly, we address Morales's argument that the ALJ erred by failing to resolve inconsistencies between the VE's testimony and the temperaments required of the three jobs that the ALJ found Morales could perform at step five.  Morales contends that, according to the Revised Handbook for Analyzing Jobs ("RHAJ") published by the U.S. Department of Labor, all three jobs have an "R" temperament, which indicates "[p]erforming repetitive work, or performing continuously the same work, according to set procedures, sequence, or pace."  But, according to Morales, that

temperament is inconsistent with the ALJ's specified limitations of "no rigid production pace" and "no strict production standard." So he says a conflict exists between the VE's testimony and the DOT.

According to Social Security Ruling 00-4p ("SSR 00-4p"), neither the VE's testimony nor the DOT automatically trumps when there is a conflict between the two. SSR 00-4p, 65 Fed. Reg. 75759-01, 75760 (Dec. 4, 2000). Instead, where a VE provides evidence about a job's requirements, the ALJ has an affirmative duty to inquire about any possible conflict between that evidence and information provided in the DOT. *Id.* Where the VE's evidence is inconsistent with the information in the DOT, the ALJ must resolve the conflict by eliciting a reasonable explanation from the VE before relying on the VE's evidence to support a determination that a claimant is or is not disabled. *Id.* Although SSR 00-4p is not binding on this Court, the SSA is bound to follow it. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1361 (11th Cir. 2018).

Here, Morales has pointed to no conflict between the VE's testimony and the DOT. An ALJ is required to inquire and resolve conflicts only between VE testimony and "information in the [DOT], including its companion publication, the Selected Characteristics of Occupations [("SCO")] . . . , published by the Department of Labor." SSR 00-4p, 65 Fed. Reg. at 75759. SSR 00-4p does not mention the RHAJ, and there is no indication the DOT or SCO incorporates the RHAJ. Because Morales focuses on information outside the DOT and SCO, the ALJ's duty under SSR

00-4p was not triggered, and we need not address any alleged conflict between the VE's testimony and any temperament requirements from the RHAJ.

## IV.   CONCLUSION

For these reasons, we affirm the district court's order.

**AFFIRMED.**