[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13807

Non-Argument Calendar

_____

ELISHA L. GRESHAM,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cv-00601-MRM

_____

Before WILSON, JORDAN, and BRANCH, Circuit Judges.

PER CURIAM:

Elisha Gresham, proceeding *pro se*, appeals a magistrate judge's order affirming the Social Security Administration ("SSA") Commissioner's decision denying her application for disability insurance benefits ("DIB") under 42 U.S.C. § 405(g).[1] She raises several issues on appeal, but only one of these issues is preserved for review—whether the administrative law judge ("ALJ") properly weighed the medical opinion evidence.[2] After careful review, we affirm.

---

[1] Gresham consented to the magistrate judge conducting all proceedings in the district court and issuing the final order.

[2] Gresham raises a number of issues for the first time on appeal. Specifically, she asserts that (1) she cannot do the jobs the ALJ found existed for someone with her limitations in the national economy; (2) the ALJ ignored that she was terminated from her last job because she was never medically cleared to return to work and she routinely missed work for doctor's appointments; (3) the ALJ omitted and failed to consider the vocational expert's written report; (4) the ALJ created a conflict of interest by asking Dr. Meltzer to review her file; and (5) the magistrate judge who issued the order was not the same one who presided over an earlier case conference in the underlying proceedings, which calls into question the validity of the underlying order. We decline to consider these issues as she raises them for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotation omitted)); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999) (declining to consider an issue raised before the district court and presented for the first time on appeal in a social security case); *Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir.

22-13807                Opinion of the Court                3

## I.    Background

In August 2015, at age 47, Gresham applied for DIB, asserting that she was unable to work due to disabling conditions, that started on May 20, 2015, including "spinal bifida, sciatica, [a] stroke [in the] last year, high blood pressure, depression, work and medical related stress, obesity, and right knee problems."    An agency consultant for the state reviewed the medical records Gresham submitted[3] and opined that she was not disabled.    She sought reconsideration, and a second agency consultant conducted an independent review and similarly concluded that Gresham was not disabled.    Accordingly, the agency denied her application at the reconsideration level.

Thereafter, Gresham requested and received a hearing before an ALJ.    Initially, the ALJ denied her application.    Thereafter, the Appeals Council granted Gresham's request for review and remanded the case to the ALJ for further development of the record on certain issues.    On remand, the agency's Office of

---

1999) (declining to reach appellant's argument that the ALJ should not have relied on the vocational expert's testimony because the appellant failed to raise the argument "before the administrative agency or the district court").

[3] Gresham submitted records from her primary care physician, Dr. David Krasner, along with records from several other medical entities where she received treatment for various conditions.    These records are discussed in detail later in the opinion.

Hearing Operations ordered a second hearing, at which Gresham proceeded *pro se*.[4]

### A.  The Relevant Medical Evidence

The relevant medical evidence before the ALJ at the time of the second hearing was as follows.[5]  Gresham's medical records from her primary care physician, Dr. David Krasner, revealed that she had a history of high blood pressure, obesity, transient ischemic attacks ("TIA"), and anxiety, and that she was prediabetic.

In December 2014, Gresham experienced pain in her right knee for several weeks.  Imaging of the knee identified no abnormalities and that the knee was "normal."  On January 19, 2015, Gresham visited "First State Orthopaedics," complaining of continued right knee pain.  She described the pain, which was aggravated by physical activity, as "aching, piercing and sharp."  She also reported a history of left-side sciatica.  Dr. Michael Axe aspirated her knee, gave her an injection to help with the knee pain, and ordered physical therapy for both her knee pain and sciatica.  Dr. Axe also completed an "ADA Medical Questionnaire" stating Gresham had leg pain and required a desk job with the accommodation of being allowed to get up, stretch, and walk "every hour or two" to relieve the pain.  Dr. Axe identified

---

[4] A different ALJ presided over this second hearing.

[5] In addition to the medical records, Gresham submitted three letters from her family, all dated in September 2019, in which they talked about the pain she experienced and the difficulty she had completing tasks.

Gresham's limitations as temporary and he expected the duration to be six months or less.

On February 5, 2015, at a general medical exam with her primary care physician, Dr. Krasner, Gresham reported that she felt "well with minor complaints" and had a "good energy level." She denied being in any pain. Dr. Krasner's exam indicated that her musculoskeletal system had normal strength and tone.

That same day, Gresham began physical therapy, and she continued therapy throughout the month of February for a total of nine sessions. Initially, she reported lower back pain that radiated down her left side and right knee pain. She also reported difficulty lifting objects, sitting or standing for more than one hour, and walking. She indicated that she could perform most of her job duties and home activities, but pain prevented her from doing the more physically demanding tasks. At her second, third, and fourth physical therapy sessions, Gresham reported her back was fine with no pain and significant improvement in her right knee. At her fifth and sixth visit, however, she indicated some lower back pain from sitting. On her seventh visit, she reported her back was feeling better, but she indicated that she continued to have right knee pain. At her eighth visit, she reported feeling better and that she believed she was "ready to go to a gym and continue this on [her] own." At her ninth and final visit on March 4, 2015, the progress notes indicated that "Gresham ha[d] gained range of motion and strength in both of her knees and her complaints of back pain [were] infrequent." The progress notes further indicated that she still

experienced pain with weightbearing activities. Because her back pain worsened with increased sitting, the therapist recommended that Gresham rise hourly and do extension exercises, as well as continue her strengthening work on her own.

Meanwhile, on February 27, 2015, Dr. Axe (from First State Orthopaedics) completed a Family Medical Leave Act ("FMLA") form for Gresham, in which he indicated that she would need to work on a reduced schedule because of her medical condition.[6] However, he left blank the section for estimating the treatment schedule and did not specify any reduced set of hours Gresham should work. He also indicated that if Gresham had a flare-up, it would prevent her from performing her job functions.

On May 4, 2015, Gresham returned to First State Orthopaedics for a follow-up concerning her right knee. Dr. Axe found that Gresham's "knee [had] resolved nicely with therapy," and that she had good reflexes and no gross instability. He concluded that her current problem was her back—an issue for which she would see a different doctor—and that he no longer needed to see her for the knee issue.

That same day, Gresham saw Dr. Krasner for radiating "back pain [that] has been occurring in an intermittent pattern for

---

[6] In March 2015, Gresham requested Dr. Krasner's assistance with FMLA forms "due to stress at work." At that time, she reported feeling well, sleeping well, and having good energy levels, but that she also had back and joint pain.

22-13807               Opinion of the Court                7

years." She also reported fatigue, neck pain and stiffness, back and joint pain, and paresthesia (tingling/numbness) in her legs. She indicated that the back pain was "aggravated by bending, twisting, lifting, sitting, standing and walking," and was relieved by bed rest, elevating her legs, taking Tylenol, applying heat or ice, and physical therapy. Upon a physical examination, Dr. Krasner noted no leg weakness but observed tenderness, spasms, and decreased range of motion in "L/S areas" of the spine and tenderness in Gresham's left hip. He diagnosed her with sciatica and prescribed her physical therapy. He also noted that Gresham "decline[d] injections due to [a history of] spina bifida." He instructed her to avoid pushing, pulling, and lifting anything over 10 pounds for the next six months. Dr. Krasner gave Gresham a sick note, indicating that she could return to work on May 6, 2015.

Three days later, on May 7, 2015, Dr. Krasner completed an FMLA form for Gresham, stating that she had "sciatica [and] difficulty walking," which had existed from September 1998 to present, and that these conditions would require absences from work during flare-ups, limited activity, and bedrest. He noted that Gresham could not "lift, push or pull objects over 10 [pounds]" and "may not be able to perform [her] job comfortably during flare-ups." He wrote that Gresham's condition would worsen with "fast pace or quick [and] sudden physical movement" and that she should avoid those type of movements during a flare-up. He also stated that Gresham should not "over exert" herself and should rest as much as possible during flare-ups, including lying "flat [with] leg[s] [and] back elevated." In terms of leave needed from her job,

8                  Opinion of the Court                22-13807

Dr. Krasner indicated that she would require intermittent leave as needed.

On May 20, 2015, Gresham returned to Dr. Krasner for a "recheck" of her back pain. Gresham reported that the pain in her lower back had increased in frequency and intensity "due to stress at work." She maintained that the pain was "aggravated by bending, twisting, lifting, sitting, standing and walking" and relieved by bed rest, changing positions, medication, the application of heat and ice, and both massage and physical therapy. Dr. Krasner's examination revealed tenderness, spasm, and decreased range of motion in the lumbar sacral area. Dr. Krasner again diagnosed Gresham with sciatica and ordered physical therapy. He further noted that Gresham indicated that the stress at work caused her back pain and that she wanted to take "a leave of absence" until July 8, 2015. Dr. Krasner indicated that she should "see [him] prior to then."[7]

Gresham returned to physical therapy on May 27, 2015, reporting back, left leg, and buttock pain. Gresham attended eight therapy sessions between May 27, 2015 and July 22, 2015, during which she indicated she made some progress, although still

---

[7] The next day, Dr. Krasner filled out FMLA paperwork stating that Gresham would need leave from work until July 18, 2015, due to sciatica and "stress" and would need "good ergonomics and the freedom to move around during the work day" once she returned. A few weeks later, Dr. Krasner also completed short term disability paperwork indicating that Gresham was temporarily unable to work due to sciatica and stress at work with an expected return to work date of July 8, 2015.

experienced some occasional pain, particularly after doing housework, standing for an extended period of time, and going to the beach. On her final visit on July 22, 2015, however, Gresham reported feeling better with no back pain and that her doctor felt that she was ready to be discharged.

Meanwhile, Gresham saw Dr. Krasner on July 1, 2015, for "a recheck of [s]tress" stemming from her job. At that time, she did not report any back pain and denied any joint pain or muscle cramps. Dr. Krasner's physical examination revealed "mild tenderness" in the lumbar region.[8] Dr. Krasner saw Gresham again on July 21, 2015, for another "recheck of [s]tress." At that time, his progress notes indicated that Gresham "stated that 'she fe[lt] 'physically' better, but [she was] still anxious about returning to work on an emotional level'" and she wanted additional leave until September 21, 2015.

As noted previously, Gresham applied for DIB benefits on August 18, 2015. That same day, she saw Dr. Krasner complaining of back pain. At that time, Gresham self-reported that she had spina bifida and that she was diagnosed with spina bifida in 1988–1989 when she was 21 years old. Dr. Krasner's notes indicated that the medical files related to that diagnosis had been requested in

---

[8] The next day, Dr. Krasner completed additional FMLA paperwork indicating that Gresham was temporarily unable to work due to sciatica, stress at work, and a "sprain/strain" in the lumbar region of her back. He indicated that she would be incapacitated until August 2, 2015, and that she would require "good ergonomics" and "the freedom to move around during the work day once she return[ed]" to work.

order to confirm the diagnosis.  Dr. Krasner also ordered x-rays of Gresham's spine.  An x-ray showed Gresham's spine was of normal height and alignment.  No "vertebral anomal[ies]" were present. Mild degenerative changes were noted in the lumbar region, as well as a "questionable small linear lucency at the midline S1 [vertebrae] possibly from artifact or from spina bifida occulta, which is typically of no clinical significance."[9]

Gresham returned to Dr. Krasner's office on September 15, 2015, reporting back, joint, hip, and muscle pain, as well as "all over body pain."  Dr. Krasner diagnosed her with "stress at work," and his progress notes indicated that Gresham expressed a desire not to return to work.[10]  In November and December 2015, Gresham returned to Dr. Krasner for assistance in completing disability forms and to further discuss her back pain, hip pain, and leg

---

[9] Shortly thereafter, Dr. Krasner completed updated short-term disability paperwork stating that Gresham's restrictions "[were] psychological not physical."

[10] That same day, Dr. Krasner wrote a letter certifying that Gresham had "been under [his] care for work-related stress, and it [was his] opinion that she could not return to work . . . until further notice."  He stated that "[h]er condition [was] permanent."  Thereafter, in October 2015, Dr. Krasner completed more short-term disability paperwork stating that Gresham had ongoing sciatica, that was aggravated by work stressors; that she had been diagnosed with spina bifida and therefore surgery was not suggested; and that she could not do extended sitting, walking, or standing.  Although Dr. Krasner saw Gresham in October 2015 for other medical related issues, she did not report any back pain, other types of pain, or stress at her October visit.

weakness.[11]   While Dr. Krasner's treatment notes measured her vitals, they did not discuss an examination or make any objective findings.[12]

Gresham's employer, the State of Delaware, terminated her employment in January 2016.   The State also denied her unemployment benefits, as she did not certify that she was ready and able to work.

In February 2016, Dr. Krasner opined that Gresham could return to work part-time with limitations.  Specifically, Dr. Krasner stated that Gresham could work for no more than 25-hours per week with no lifting, no bending, no squatting, no pulling/pushing heavy items, no steps, no extended sitting, no extended standing, no extended driving or traveling, and "flexibility to accommodate [her] condition as needed."

That same month, Gresham saw Dr. David Sowa, at First State Orthopaedics for a mass on her left wrist causing wrist pain, as well as radiating neck pain.  An x-ray of her cervical spine showed a small bone spur at one vertebra, but "no significant

---

[11] At her December visit, Gresham also complained of headaches and neck pain.

[12] At that time, Dr. Krasner completed updated short-term disability forms for Gresham.  Notably, Dr. Krasner opined that Gresham's "sciatica [was] not preventing her from returning to work.  It's the stress."  Gresham also obtained a note from psychologist, Dr. Mary Kennedy, who had seen Gresham four times between April and November 2015.  She opined that due to Gresham's psychological distress and self-reported "continuing medical problems," Gresham should not return to work.

abnormalities." She received a referral for physical therapy for the neck pain. At a follow-up visit in April 2016, following additional testing, Dr. Sowa noted that Gresham had "persistent deQuervain's tenosynovitis of her left wrist" and scheduled out-patient surgery for the wrist.[13] He referred her to a spine center for her neck issues.

In March 2016, in connection with her DIB application, Gresham was examined by SSA's consultative examiner, Dr. Irwin Lifrak. At that time, Gresham's chief complaints were back pain radiating to both of her hips and legs, hypertension, neck pain radiating to both of her shoulders and arms, and depression. Dr. Lifrak found that Gresham was adequately developed and nourished, was in no acute distress, and walked without an assistive device "with a minimal degree of limp favoring the left [side]." Her extremities, including her legs, had full muscle strength and tone, and intact reflexes and sensation, but she had paravertebral spasms and reduced range of motion in her lumbar spine and hips. Dr. Lifrak's diagnostic impression was that Gresham had "[d]egenerative joint disease" with possible disc damage, hypertension that was under control at the time of the examination, and depression. He determined that within an eight-hour day with customary breaks and without any assistive device Gresham could perform activities requiring her to walk, either

---

[13] Following the wrist surgery, Gresham had limited range of motion in her left wrist and sensitivity at the scar site. Dr. Sowa recommended hand therapy.

indoors or outdoors; climb stairs; sit for a total of six hours out of an eight-hour day; stand for a total period of six hours out of an eight-hour day; and lift weights of up to ten pounds with each hand on a regular basis.

In September 2016, Gresham returned to Dr. Krasner, complaining of back pain. His notes indicated that Gresham stated that she was unable to perform her job duties due to the pain and she requested that Dr. Krasner give her a letter for her work. Dr. Krasner wrote a formal medical letter, stating that Gresham was under his care for sciatica, that she should "avoid excessive bending, squatting, sitting, and standing," and that she should not lift, push, or pull more than 20 pounds. Dr. Krasner's notes were similar when Gresham returned in February 2017, complaining of worsening back pain, pain in her neck, left hip, and left wrist, and requesting Dr. Krasner "certify that she [was] unable to work." Dr. Krasner ordered an MRI of Gresham's lumbar spine, an x-ray of her cervical spine, and physical therapy. He also completed paperwork stating that Gresham was expected to be unable to work for 6 to 9 months due to her sciatica, cervical pain, and lumbar pain. The x-ray of Gresham's cervical spine revealed some straightening, which was "nonspecific" and "often associated with muscle spasms." No other abnormalities were observed. The MRI of the spine revealed that the alignment was normal, but there was mild joint arthropathy in the lumbar region.

In March 2017, Gresham resumed physical therapy, reporting her back pain level as a 7 out of 10, and a 10 out of 10 on

14                    Opinion of the Court                    22-13807

bad days.   Although she continued to report some back pain throughout the course of her six-week treatment, she self-reported some improvements in her back pain and demonstrated improved functionality.

On April 26, 2017, Gresham returned to Dr. Krasner for a recheck of her back pain and stress.  In terms of her back pain, Gresham indicated that physical therapy helped the pain (which she rated as a 3 out of 10) and that she was interested in getting a transcutaneous electrical nerve stimulation ("TENS") unit, which is a medical device that sends low-voltage electric currents to nerves and helps with pain.  She reported that her stress, however, had been increasing.  Dr. Krasner again diagnosed her with sciatica and prescribed additional physical therapy.[14]

Gresham returned to physical therapy a few months later in July 2017, reporting a resting back pain level of 3 out of 10, and a 10 out of 10 with physical activity.  During the course of her treatment between July 27 and October 9, 2017, Gresham gradually

---

[14] Approximately a week later, Gresham went to the emergency room for left hip and groin pain, but imaging of her pelvis and left hip revealed "no evidence of acute fracture or dislocation," and "no evidence of any arthritic changes." The emergency room physician noted that Gresham's pain was "suggestive of suspect musculoskeletal etiology," such as a "muscle strain, tendinitis, or injury" and "less consistent with sciatica or [a] lumbar source."  A few days after her emergency room visit, Gresham returned to Dr. Krasner for the left hip pain, rating it as a 5 out of 10.  Dr. Krasner's notes indicated that, at that time, Gresham indicated that she "want[e]d to hold off on [physical therapy." Dr. Krasner referred her to an orthopedic surgeon for the hip pain and prescribed some medication.

reported improvement in her symptoms. Although at times Gresham indicated she felt worse, particularly after weekend activities such as "walking in Ocean City" or doing "a lot of" shopping, cooking, and cleaning. The physical therapist's assessments indicated that Gresham showed an improvement in her range of motion and functional limitations.

On September 6, 2017, Gresham visited Dr. Anne Mack, M.D., based on a referral from Dr. Krasner for lower back pain and hip pain, which she rated as an 8 out of 10.[15] On examination, Dr. Mack noted that Gresham had a reduced range of motion in the cervical and lumbosacral areas of the spine, and a normal range of motion in the thoracic area of the spine. Gresham also had full range of motion and strength in her extremities. Dr. Mack recommended that Gresham continue with physical therapy.

On September 18, Dr. Krasner completed a document entitled "Treating Source Statement—Physical Conditions" related to Gresham's disability claim in which he opined that Gresham likely would be off task for more than 25% of a typical workday and miss more than four days of work per month as a result of her ailments, which included "sciatica, severe stress, left hip pain, spinal dysplasia, [and] TIA." Dr. Krasner further opined that Gresham could continuously lift or carry items lighter than 10 pounds; could frequently lift or carry items that were 10 pounds; could never lift or carry items 20 pounds or heavier; could sit, stand, and walk for

---

[15] Notably, on this same day, Gresham had a physical therapy visit at which she reported "feeling better" and that he was "starting to feel better overall."

only 1 hour in an 8-hour workday; required the option to sit/stand at will; and occasionally required the use of a cane or other assistive device.  He indicated that Gresham could occasionally reach overhead and push/pull; frequently reach in all other directions; continuously perform handling, fingering, and feeling; continuously use foot controls; never balance, crawl, or climb ladders; rarely climb stairs and ramps, stoop, kneel, or crouch; and could frequently rotate her head and neck.  Turning to environmental limitations, Dr. Krasner stated that Gresham could never be around unprotected heights, moving mechanical parts, dust/odors/fumes/pulmonary irritants, and extreme cold; occasionally be around humidity, wetness, extreme heat, and vibrations; and could frequently operate a vehicle.

On October 6, 2017, Gresham returned to Dr. Mack, reporting lower back and hip pain with radiating pain down her legs.  She described the pain as "moderate" and "constant," rating it as a 6 out of 10.  Upon examination, Gresham again had decreased range of motion in her cervical and lumbosacral areas of the spine and a full range of motion in her extremities.  She also exhibited pain in her left ankle with certain movements.  Dr. Mack ordered an x-ray of the ankle, which did not reveal any abnormal findings.  She recommended that Gresham return for a recheck in approximately 6 weeks.

Three days later, on October 9, 2017, Gresham completed her last physical therapy visit.  During this visit, Gresham reported that she felt "about 40% better," and she rated her back pain a 2 out

of 10 at rest, and a 7 out of 10 during activity. The physical therapist reported that Gresham had "shown objective improvement with lumbar [range of motion] and subjectively report[ed] improvement with functional activities and independent management of symptoms. She [also] present[ed] with improvement in gait mechanics with no noted deficits pre and post session."

Two days later, Gresham saw Dr. Krasner for a pre-op evaluation related to a scheduled hysterectomy.[16] Dr. Krasner noted that Gresham reported "feel[ing] well with minor complaints" and that she was not currently in pain. As part of the physical examination, he noted that her gait and posture were normal and that she was not in any acute distress.

In March 2018, Dr. Mack ordered an MRI of Gresham's lumbar spine. The MRI indicated that Gresham had "[l]ower lumbar degenerative disc disease and facet arthritis" with "moderate to severe bilateral foraminal stenosis" and a disc bulge abutting a nerve root in the lower lumbosacral region of the spine.

In April 2018, shortly before her hysterectomy, Gresham returned to Dr. Krasner's office seeking help with completing disability related forms. At that time, she reported "feel[ing] well

---

[16] Gresham needed a hysterectomy to resolve issues related to numerous fibroids, which doctors also thought could possibly be contributing to her back pain. The surgery, however, was delayed, and Gresham had a second pre-op evaluation performed in March 2018, that included nearly identical findings. The medical records indicate that the hysterectomy was performed successfully in mid-April 2018.

with no complaints," "sleeping well," and "ha[ving] [a] good energy level." She denied currently being in pain. Gresham indicated to the nurse practitioner in Dr. Krasner's office that she "needed [a] permanent disability form for her back" and that Dr. Mack told her that the MRI revealed arthritis in her neck. The nurse practitioner's physical examination indicated that Gresham had full range of motion in her neck with some discomfort. She instructed Gresham to consult with Dr. Mack about the disability forms.

In October 2018, Gresham again visited Dr. Mack for pain in her lower back, hip, and left knee. She reported the back pain as an 8 out of 10. On examination, Dr. Mack noted a reduced range of motion in Gresham's cervical and lumbar spine, an antalgic gait, evidence of swelling in the knee, and a full range of motion in the ankle (but accompanied by pain), but otherwise no abnormalities, noting full strength in all muscles.[17] She ordered a CT scan of Gresham's lumbar spine, x-rays of her left knee and right foot, and a straight cane due to knee pain. The CT scan confirmed "[d]egenerative changes" of Gresham's lumbar spine at two levels.

In June 2019, Gresham had an operation to treat a hernia. In August 2019, Dr. Wynn, the surgeon who treated Gresham for the hernia, opined that Gresham could not return to work until September 23, 2019, and when she returned she could not push,

---

[17] Subsequent examinations performed by Dr. Mack in November 2018, August 2019, September 2019, and October 2019 contained substantially similar results to that of the October 2018 examination.

pull, or lift anything over 10 pounds.  Dr. Wynn lifted these restrictions in late September 2019, stating that Gresham was allowed "to perform normal duties up to her capacity."

In October 2019, an unnamed individual at Thrive Physical Therapy completed a one-time "Functional Assessment Report" for Gresham's disability application.  The report indicated that Gresham experienced right knee and lower back pain with all of the physical function tests, but that it was difficult to fully assess her abilities and strengths or barriers to her ability to work due to restrictions that she was under from hernia surgery.  In terms of Gresham's ability to work, the report indicated that the "[o]nly option that would work per discussion with client is part time light duty with a flexible schedule that [could] allow for frequent call outs for doctors visits or if having a bad day with pain or limitations."  The therapist recommended that Gresham could perform "[p]art time light duty" work.  The report further opined that Gresham could occasionally stand or walk; could constantly sit; rarely lift any weight less than 10 pounds; never lift any weight more than 10 pounds; frequently use her arms and hands; would never need to recline or elevate feet; could never crouch or climb a ladder; could rarely bend, walk, kneel or crouch; and occasionally stand, sit, or work while standing.

Finally, records indicated that in November 2019, Gresham applied for a handicap parking placard, and Lindsay Kelly, a family nurse practitioner, completed the necessary forms, certifying that Gresham could not walk more than 200 feet without stopping for

rest and required a cane as an assistive device, and that Gresham had no prognosis for improvement.

### B. *Testimony Before the ALJ*

At the second hearing on her disability application, Gresham provided testimony concerning her prior occupations and her physical ailments and associated pain. Regarding her prior occupations, she previously worked as a behavioral therapist for mentally and physically disabled residents in a group home. Next, she worked as a preschool teacher, which involved writing up various lesson plans and reports. Then she worked as a customer service representative in the collections department of a financial company for a year, which involved mainly "sit down" work. Finally, she worked as an administrator (and later as the purchasing services coordinator) in the procurement unit of a state agency in Delaware, where she was responsible for a wide variety of administrative tasks and frequently traveled between offices. In this role, she was responsible for handling phones, transporting large boxes of documents weighing over 20 pounds, and writing and editing contracts.

Turning to her impairments, Gresham testified that, in May 2015, she became disabled after she experienced "a stress breakdown and the pain became intolerant to where [she] could . . . barely move [her] left leg." She also suffered "memory setbacks" around this time. Gresham explained that she had been using a cane prescribed by Dr. Mack as a mobility assistive device for the last year. She stated that she lived with her husband and

her two daughters, ages 26 and 17, and that they helped her cook and do things around the house like cleaning and laundry. She explained that sometimes she gets "the tinglys" in her legs and that pain medications, her TENS unit, physical therapy, massages and a heating pad helps. She confirmed that she had never had any surgery on her back and that she was still recovering from the hernia repair.

When asked to describe the problems that have prevented her from working since 2015, Gresham stated it was: her constant back, right knee, and ankle pain; hip pain for which she went to the emergency room in 2017; her hysterectomy, during which cancerous cells were discovered and removed successfully; neck issues that developed in 2018; shoulder pain; and her hernia. She explained that, in 2016, she felt capable of at least doing part-time work, and she completed 200 job applications, but was unable to find work. She stated that she also suffers from TIA strokes, high blood pressure, and diabetes.

A vocational expert ("VE") then testified in response to three hypotheticals from the ALJ. The ALJ's first hypothetical involved an individual of Gresham's age and skills who could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and tolerate occasional exposure to vibration and hazards. The VE testified that a person with these

limitations could perform three of Gresham's prior jobs, namely, her work as a purchasing agent, secretary, and collection clerk. Additionally, the VE testified that the hypothetical individual could work as a file clerk, as a general clerk, or in a wide range of sedentary positions available in the national economy.

The ALJ next reduced the lift limit to 10 pounds and the time standing or walking to two hours out of an eight-hour day, keeping the remainder of the limitations the same. The VE testified that such an individual could perform two of Gresham's prior jobs, namely, that of a collection clerk and secretary. The VE further testified that such limitations would limit an individual to sedentary work, identifying a data entry clerk, an information clerk, and a data clerk as additional positions such a person could fill.

For the third and final hypothetical, the ALJ added to the limitations that the individual would require a cane to balance and would be off-task 25 percent of the workday. The VE testified that such an individual could not perform any of Gresham's prior positions or any other position in the workforce. The ALJ then removed the limitation of being off-task for 25 percent of the workday, but still required the use of a cane. The VE testified that such an individual would be able to perform the same positions identified in the second hypothetical.

Finally, at the request of Gresham, the VE next considered an individual with the same limitations who needed to miss work on average four days a month due to an ailment or to see a doctor.

The VE testified that such a limitation would be work preclusive, even if further limited to only missing part of the day once a month for a doctor's appointment.

Gresham then explained that "it's not that [she] can't do work," she just needs flexibility. The ALJ explained that because Gresham had various ailments, he was going to have an independent doctor review Gresham's complete file, look at everything collectively, and then write up a report. The ALJ would then review that report along with all the other evidence in the record and make a determination.

### C. Post-Hearing Evidence

In February 2020, at the request of the ALJ, Dr. Seth Meltzer reviewed Gresham's file. Dr. Meltzer identified Gresham as suffering from the following impairments: sciatica, DeQuervian's tenosynovitis, stroke, and hypertension. He then explained that none of these impairments met or equaled any impairment in the agency's Listing of Impairments.[18]

He next opined that, with her ailments, Gresham could continuously lift or carry up to 10 pounds; frequently lift or carry up to 20 pounds; occasionally carry, but never lift between 20 and 50 pounds; sit two hours at a time and up to four hours per

---

[18] In particular, he explained that Gresham's back issues did not meet the listing of impairments for disorders of the spine because although the MRI showed evidence of facet arthritis, degenerative disc disease, and stenosis in the lumbar region, "there [was] no evidence of neuroanatomic motor loss, motor weakness, loss of reflex, or positive SLR."

workday; stand and walk for 30 minutes at a time and up to two hours per workday.  Dr. Meltzer further opined that Gresham could frequently reach, handle, finger, feel, push, and pull; continuously use foot controls; occasionally climb stairs, ramps, ladders, and scaffolds; frequently balance; never stoop, kneel, crouch, or crawl; occasionally be exposed to heights and moving mechanical parts; and be exposed to very loud noises.  Meltzer cited to specific documents in the record in support of his findings.[19]

Following the second hearing, Gresham submitted additional medical evidence, which included a cardiologist report from January 2020 that stated that Gresham reported feeling great with no back or joint pain.  Upon examining Gresham, the cardiologist reported that her extremities, motor strength, and reflexes were normal.  And a February 2020 "medical statement of ability to do work-related activities" from a nurse practitioner in Dr. Krasner's office, indicated that, due to a history of "spinal dysplasia, TIA[,] [and] arthritis," Gresham had the following physical limitations: she could frequently lift or carry up to 10

---

[19] After Dr. Meltzer completed his report, the ALJ requested that the VE complete an updated interrogatory on Gresham's ability to work.  The interrogatory asked the VE to consider whether a hypothetical person of Gresham's age, education, and skill, could perform any of her prior positions or other positions in the workplace if they had limitations identical to those found by Dr. Meltzer.  The VE certified that such an individual could perform two of the Gresham's prior positions, namely, a purchasing agent and an administrative assistant.  The VE also certified that such an individual could perform as a general clerk, administrative clerk, purchasing clerk, receptionist, payroll clerk, router, fingerprint clerk, or microfilm mounter.

pounds; occasionally lift or carry up to 20 pounds; sit for one hour at a time and up to eight hours a day; stand for less than 5 minutes at a time and up to 1 hour in a day; walk for less than 30 minutes and up to 1 hour in a day; required a cane to ambulate; could occasionally reach with her hands; could continuously handle, finger, feel, and push/pull with each hand; could continuously operate foot controls; could never climb stairs, ramps, ladders, or scaffolds; could never balance, stoop, kneel, crouch, or crawl; could never be exposed to unprotected heights, moving mechanical parts, humidity/wetness, dust, odors, fumes, pulmonary gases, extreme cold, extreme heat, or vibrations; could occasionally operate a motor vehicle; and could be exposed to moderate noise levels. The nurse practitioner further opined that Gresham's impairments met or equaled an impairment on the agency's Listing of Impairments, though she did not specify which one or ones were met and did not specify any evidence that supported this finding.

### D. The ALJ's Decision

Employing the SSA's five-step sequential evaluation process for determining whether a claimant is disabled, the ALJ denied Gresham's application.[20] The ALJ found that Gresham had not

---

[20] The evaluation process involves the following five determination steps: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether she "has a severe impairment or combination of impairments"; (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings in the regulations; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on her age, education, and work experience, she can perform other

engaged in substantial gainful activity since May 20, 2015, and was severely impaired from "obesity, degenerative disc disease of the lumbar spine, and left DeQuervain's tenosynovitis." At step three, the ALJ determined that Gresham's impairments did not meet or medically equal any listed impairment under the relevant Social Security regulations.[21] At step four, the ALJ then determined that Gresham had:

> the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except she can lift and carry 20 pounds frequently and 50 pounds occasionally, sit for 2 hours at a time for a total of 4 hours out of an 8-hour workday, stand 30 minutes at a time for a total of 2 hours out of an 8-hour workday, and walk 30 minutes at a time for a total of 2 hours in an 8-hour workday. The claimant can frequently reach in all directions bilaterally with the upper extremities. She can occasionally climb stairs and ramps, occasionally climb ladders or scaffolds, frequently balance, and never stoop, kneel, crouch, or crawl. The claimant can tolerate occasional exposure to unprotected heights and moving mechanical parts. She can tolerate very loud noise.

---

work found in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

[21] A claimant bears the burden of showing her impairments meet or equal a listing. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

22-13807          Opinion of the Court          27

In reaching this conclusion, the ALJ found that Gresham's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Gresham's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." For instance, the ALJ noted that the objective evidence in the record indicated that Gresham's back issues improved with physical therapy and she frequently reported feeling better, such that Gresham's "allegations of disabling symptoms and limitations are inconsistent with and unsupported by the evidence."

As for the medical opinion evidence, the ALJ gave little to no weight to the opinions provided by Dr. Krasner, Dr. Wynn, Dr. Lifrak, and the Thrive Physical Therapy Functional Assessment Report. The ALJ explained that Dr. Krasner's opinions as to Gresham's limitations and her inability to work were not supported by the objective medical evidence or constituted findings on an issue reserved to the Commissioner. Similarly, "the evidence as a whole, including the physical examination findings, [did] not support such restrictive limitations" as those indicated in Dr. Wynn's medical opinion. The ALJ explained that he gave little weight to the agency examiner Dr. Lifrak's 2016 consultative examination because "the weight of the evidence, including the mostly normal strength findings, do not support limiting lifting and carrying to 10 pounds bilaterally." The ALJ also explained that it gave little weight to the Functional Assessment Report completed by Thrive "because the examiner was unable to fully assess

[Gresham's] ability" due to restrictions that Gresham was still under after her hernia surgery. On the other hand, the ALJ gave great weight to Dr. Meltzer's opinion, because he had the opportunity to review Gresham's entire file and the RFC he provided (which the ALJ adopted) was supported by the record.

In light of Gresham's RFC, the ALJ determined that Gresham could perform past relevant work as a purchasing agent and an administrative assistant. Alternatively, the ALJ proceeded to step five and determined that Gresham could perform other jobs in the national economy such as a router, fingerprint clerk, and microfilm mounter. Consequently, the ALJ found that Gresham was not disabled.

Gresham requested discretionary review of the ALJ's decision by the SSA Appeals Council, and her request was denied. Gresham then obtained counsel and filed a complaint in the district court, raising two issues: (1) whether the ALJ failed to properly evaluate and weigh the medical opinion evidence—in particular the opinions of Dr. Krasner, Dr. Wynn, and Dr. Lifrak, and the Thrive Physical Therapy Functional Assessment—as required under "SSA policy and Eleventh Circuit precedent"; and (2) whether the ALJ and Appeals Council judges were properly appointed, and, if not, whether remand was necessary. A magistrate judge, acting on behalf of the district court, affirmed the ALJ's decision and rejected Gresham's appointments challenge. Gresham, proceeding *pro se*, appealed the decision.

## II.    Standard of Review

"When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, we review the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). "[W]e review *de novo* the legal principles upon which the Commissioner's decision is based," and "we review the resulting decision only to determine whether it is supported by substantial evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see also Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1103 (11th Cir. 2021) ("Substantial evidence is less than a preponderance, and thus we must affirm an ALJ's decision even in cases where a greater portion of the record seems to weigh against it." (quotation omitted)). "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (alteration in original) (quotation omitted). "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004) (quotation omitted).

## III.    Discussion

Gresham challenges the ALJ's weighing of medical opinions, asserting that the ALJ erred in giving more weight to Dr. Meltzer's

opinion than the "independent medical professional experts who actually worked with [her]."[22]

To obtain social security disability benefits, the applicant must prove she is disabled. *See Barnhart v. Thomas*, 540 U.S. 20, 21 (2003). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the person] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When making the disability assessment, the ALJ must give special attention to the medical opinions, particularly those of the treating physician. SSA regulations in force at the time Gresham filed her application required an ALJ to give "controlling weight" to a treating physician's opinion if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the]

---

[22] Gresham does not state to which of the treating "independent medical professional experts" she is referring. Nevertheless, we assume for purposes of this opinion that she is referring to the same treating physician opinions that she took issue with in the district court, namely, those of Dr. Krasner, Dr. Wynn, and Dr. Lifrak, and the Thrive Physical Therapy Functional Assessment. Therefore, we focus on those opinions.

case record." 20 C.F.R. § 404.1527(c)(2).[23]  Good cause to discount a treating physician's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation omitted).

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Id.*  There are no magic words to state with particularity the weight given to the medical opinions.  Rather, the ALJ must "state with at least some measure of clarity the grounds for his decision."  *Id.* (quotation omitted).  "We will not second guess the ALJ about the weight the treating physician's opinion deserves so long as [the ALJ] articulates a specific justification for it." *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015).

State agency medical consultants, like Dr. Lifrak and Dr. Meltzer, are considered experts in social security disability evaluations, and the ALJ must consider and assign weight to their opinions in the same manner as other medical sources. *See* 20 C.F.R. §§ 404.1527(e), 404.1513a(b).  The weight to be given to a non-examining physician's opinion depends on, among other considerations, the extent to which it is consistent with other

---

[23] In 2017, the SSA amended its regulations and removed the "controlling weight" requirement for all applications filed after March 27, 2017.  *See* 20 C.F.R. §§ 404.1527, 404.1520c.  Because Gresham filed her DIB application in 2015, the former regulations apply.

evidence. *See id.* § 404.1527(c)(4). When reviewing the report of a consultative examiner, the ALJ considers whether the report "provides evidence [that] serves as an adequate basis for decision-making," "is internally consistent," and "is consistent with the other information available." *Id.* § 404.1519p(a)(1)-(3).

In this case, the ALJ provided good cause for not giving controlling weight to the opinions of Dr. Krasner, Dr. Wynn, Dr. Lifrak, and the functional assessment prepared by Thrive Physical Therapy. For instance, the ALJ explained that he gave little to no weight to Dr. Krasner's numerous opinions between 2015 and 2020 because Dr. Krasner's opinions as to Gresham's limitations and her inability to work were not supported by the objective medical evidence. The ALJ's conclusion is reinforced by the record. Dr. Krasner's opinions were not supported by many of the objective medical findings, including the physical therapy progress reports. Furthermore, although Dr. Krasner opined in 2020 that Gresham had impairments that met the agency's Listing of Impairments and was therefore disabled, a medical source's opinion that a claimant is "disabled" or "unable to work" is not dispositive of a disability claim because that determination is reserved to the agency. 20 C.F.R. § 404.1527(d)(1); *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1339 (11th Cir. 2021).

Turning to the opinions of Dr. Wynn, the surgeon who treated Gresham for her hernia, the ALJ explained that he gave limited weight to Dr. Wynn's opinion—namely, that Gresham was unable to work between August and September 2019 and that

Gresham should be restricted from pushing, pulling, prolonged sitting, standing, or walking, and lifting more than 10 pounds—because the evidence as a whole did not support these restrictive limitations.  Similarly, the ALJ explained that he gave no weight to Dr. Wynn's opinion that, as of September 23, 2019, Gresham could perform her normal duties "up to her capacity" because the opinion provided no specific functional limitations.  Where, as here, the ALJ provides a specific justification for affording lesser weight or otherwise discounting a treating physician's opinion, we will not second guess the ALJ's decision.  *See Hunter*, 808 F.3d at 823.

Next, the ALJ provided good cause for giving only limited weight to the opinion of the consulting doctor, Dr. Lifrak, who opined in 2016 that Gresham could lift or carry weights of up to 10 pounds and could perform activities requiring her to walk, either indoors or outdoors; climb stairs; sit for a total of six hours out of an eight-hour day; stand for a total period of six hours out of an eight-hour day.[24]  Specifically, the ALJ found that the lift and carry capacity proposed by Lifrak was unsupported by the mostly normal strength findings in the medical records.  The ALJ's statement is supported by the collective medical evidence and

---

[24] Notably, aside from the lift/carry restriction, Dr. Lifrak's restrictions were less restrictive than those found by the ALJ.  Thus, even if the ALJ had given Dr. Lifrak's opinion controlling weight, it would not have changed the outcome.

provides good cause for giving only limited weight to Dr. Lifrak's opinion.

Likewise, the ALJ explained that he gave limited weight to the Thrive Physical Therapy Functional Assessment Report which limited Gresham to part-time light duty work with a flexible schedule because the unidentified examiner indicated that he or she was unable to fully assess Gresham's abilities and limitations due to restrictions that Gresham was still under from her hernia surgery. The ALJ's statement provides good cause for giving the assessment limited weight, and is consistent with the examiner's statement in the report. *See Winschel*, 631 F.3d at 1179. Furthermore, the assessment was prepared for purposes of Gresham's disability application, and, therefore, it was not a "treating source" and not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(a)(2) ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.").

Finally, the ALJ explained that he gave great weight to Dr. Meltzer's opinion because Dr. Meltzer "had the opportunity to review [Gresham's] entire file" and he provided an RFC supported by the objective medical evidence in the record. The ALJ's statement is supported by substantial evidence in the record.

Accordingly, the ALJ provided specific justifications for giving less than controlling weight to Gresham's the challenged

opinions and for giving greater weight to Dr. Meltzer's opinion. Thus, the ALJ satisfied the good cause standard, and we will not second guess the ALJ's decision. *See Hunter*, 808 F.3d at 823; *see also Crawford*, 363 F.3d at 1158–59 ("Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." (quotation omitted)). Consequently, we affirm.

**AFFIRMED.**